## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

**CLUB GALLISTICO DE PUERTO RICO INC. et al.,**

**Plaintiffs,**

**v.**

**UNITED STATES OF AMERICA et al.,**

**Defendants.**

**CIVIL NO. 19-1481 (GAG); (consolidated with Civil No. 19-1739 (GAG))**

## <u>OPINION AND ORDER</u>

"What's good for the goose is good for the gander." This well-known proverb illustrates the central issue in the case at bar: equal treatment before the law. In <u>United States v. Pedro-Vidal</u>, 371 F. Supp. 3d 57 (D.P.R. 2019), the Court noted that since the territory of Puerto Rico's acquisition in 1898, "Congress has enacted thousands of federal laws that apply therein." <u>Id.</u> at 58. Moreover,

> Congress has the authority to enact laws that apply to citizens in the territory of Puerto Rico *exactly* as they would to citizens in the States. However, by way of legislation, Congress may treat differently citizens in the territory, for example, those which cap Social Security, Medicare, and Veteran benefits.

<u>Id.</u> at 58-59. The <u>Pedro-Vidal</u> case involved the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. §§ 3591-3598, and whether it applied to the Commonwealth of Puerto Rico just as in every state. The Court ruled that it did. Similarly, Section 12616 of the Agriculture Improvement Act of 2018, *infra*, that amends the Animal Welfare Act of 1966 (AWA), *infra*, falls within that first category of laws. Under the Commerce Clause, Congress has the unquestionable authority to treat the Commonwealth *equally* to the states. Neither the Commonwealth's political status, nor the Territorial Clause, impede the United States Government from enacting laws that apply to all citizens of this Nation alike, whether is a state or territory.

Civil No. 19-1481 (GAG)

On May 22, 2019 Club Gallístico de Puerto Rico, Inc. ("Club Gallístico") and other plaintiffs[1] filed a Complaint (Civil No. 19-1481 (GAG)), pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, against the President of United States, the United States Government, and other defendants[2] alleging that the recent section 12616 amendments to the AWA which extend the prohibition on animal fighting ventures to the Commonwealth of Puerto Rico and other territories violate bedrock principles of federalism and rights protected under the United States Constitution. On August 1, 2019, Asociación Cultural y Deportiva del Gallo Fino de Pelea ("Asociación Cultural") and other plaintiffs[3] filed a parallel complaint (Civil No. 19-1739 (GAG)), against the United States Government and all other defendants proffering similar allegations as in Club Gallístico's suit and pleading additional constitutional rights violations. On August 5, 2019, this Court consolidated both actions.[4]

The two lead Plaintiffs, Club Gallístico and Asociación Cultural, are both non-profit organizations involved in the Commonwealth of Puerto Rico's cockfighting industry. (Docket Nos. 1; 16). The former operates one of the largest and "most visited" cockfighting arenas in the island and the latter is an association whose goal is to promote and preserve cockfighting in the territory. Id. The remaining Plaintiffs have participated in the Commonwealth's cockfighting world as cockpit owners, cockpit judges and other officials, gamecock breeders and owners, artisans, and otherwise cockfighting enthusiasts. They all request this Court to issue a declaratory judgment holding that the

---

[1] The other plaintiffs include Mr. Luis Joel Barreto Barreto, Mr. Faustino Rosario Rodríguez, Mr. Carlos Quiñones Figueroa, and Mrs. Nydia Mercedes Hernández. (Docket No. 1).
[2] The other defendants are: the U.S. Attorney General, the U.S. Department of Justice, the U.S. Secretary of Agriculture and the Department of Agriculture. (Docket No. 1).
[3] The other plaintiffs include Mr. Ángel Manuel Ortiz Díaz, Mr. John J. Oliveras Yace, Mr. Ángel Luis Narváez Rodríguez and Mr. José Miguel Cedeño. (Docket No. 16).
[4] On this date, Club Gallístico and others amended their original complaint to include a new plaintiff, Mrs. Laura Green. (Docket No. 21).

Civil No. 19-1481 (GAG)

Section 12616 amendments are unconstitutional. Following the filing of the Complaints, the parties agreed to a fast-tracked briefing schedule for summary judgment cross-motions and replies.

Currently, pending before the Court are Plaintiff Club Gallístico and others' Motion for Summary Judgment (Docket No. 34) and Defendant United States and others' Cross-Motion for Summary Judgment.[5] (Docket No. 38).

## I.    Background

### A.   Legal History of Cockfighting

According to the Encyclopedia Britannica, *cockfighting* is "the sport of pitting gamecocks to fight and the breeding and training of them for that purpose." *Cockfighting*, Encyclopædia Britannica (2016). Similarly, renowned folklorist Alan Dundes indicates that "[t]he cockfight, in which two equally matched roosters -typically bred and raised for such purposes and often armed with steel spurs (gaffs)—engage in mortal combat in a circular pit surrounded by mostly if not exclusively male spectators, is one of the oldest recorded human games or sports." A. Dundes, The Cockfight: A Casebook vii (University Wisconsin Press, 1994). Professor Dundes further highlights that the contest has been "banned in many countries on the grounds that that [it] constitutes inhumane cruelty to animal" yet "continues to flourish as an undergrounds or illegal sport." Id.

In colonial North America, cockfighting was introduced at an early date and reached its peak popularity between 1750 and 1800; notably in the colonies that extended from North Carolina to New York. Ed Crews, *Once Popular and Socially Acceptable: Cockfighting*, The Colonial Williamsburg Journal (Autumn 2008) available at https://www.history.org/Foundation/journal/Autumn08/rooster.cfm. Nonetheless, during these

---

[5] For purposes of this Opinion and Order, the Court will either refer to Plaintiffs and Defendants collectively or only to lead Plaintiff Club Gallístico and/or Defendant United States. Notwithstanding, the Court's reasonings and rulings equally apply to all Plaintiffs and Defendants.

Civil No. 19-1481 (GAG)

years the colonial authorities occasionally tried to ban it. For example, in 1752, the College of William and Mary directed its students to avoid them all together. Id. Following the Revolutionary War, "some citizens of the new United States looked upon cockfighting as an unsavory vestige of English culture and advocated its abandonment." Id. By the mid-1800s, cockfighting was mostly considered "cruel and wrong" and several states had passed laws against animal cruelty, including Massachusetts. Id.; see also Commonwealth v. Tilton, 49 Mass. 232 (1844).

In the case of Puerto Rico, historians posit that cockfighting has been practiced in the island since the late eighteenth century. Following the United States' acquisition of the territory in 1898, General Guy Vernor Henry, the island's second military governor, enacted a law forbidding animal cruelty, which specifically included cockfights. See BEAKS AND SPURS: COCKFIGHTING IN PUERTO RICO, National Register of Historic Places Multiple Property Documentation Form, National Parks Services (May 29, 2014). This prohibition lasted until August 12, 1933 when Governor Robert Hayes Gore approved a law, authored by then Senate President Rafael Martínez Nadal, making these contests legal once again. In the decades following this law's approval, others were passed that sought to regulate every aspect of this industry. The most recent of these laws is the Puerto Rico Gamecocks of the New Millennium Act, Act 98-2017 as amended, P.R. LAWS ANN. tit. 15, §§ 301 et seq. Under this Act, the Commonwealth's government enabled cockfighting; delegated its oversight to the Sports and Recreation Department; authorized the issuance of licenses to cockpits, gamecock breeders, and cockfight judges; and, established penalties for anyone who violated this law. Id.

On the other hand, and as detailed in the subsequent section, since 1976 Congress has progressively outlawed cockfighting throughout the Nation. Parallel to efforts at the federal level, all fifty states, and the District of Columbia, have effectively prohibited these fighting ventures. See

Civil No. 19-1481 (GAG)

COCKFIGHTING LAWS, National Conference of State Legislatures, Vol. 22, No. 1 (January 2014). Louisiana's ban passed in 2007 and it is the most recent state legislative action in this direction. <u>Id.</u> Although cockfighting remains illegal in all states, punishments vary across the board; some states prohibit ancillary activities, thirty-one states permit possession of cockfighting implements and twelve states allow possession of fighting live-birds, even though cockfighting itself remains illegal. <u>Id.</u> Until the passage of the Agriculture Improvement Act of 2018, the only jurisdictions that had not proscribed cockfights comprised the Commonwealth of Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands and the United States Virgin Islands. <u>Id.</u>

**B. The Animal Welfare Act of 1966**

In 1966, Congress enacted the Laboratory Animal Welfare Act (LAWA) primarily "to protect the owners of dogs and cats from theft of such pets" and to prevent the sale or use of stolen pets and ensure humane treatment in research facilities. <u>See</u> Laboratory Animal Welfare Act, 7 U.S.C. §§ 2131-2159 (1994 & Supp. V). Four years later, the Animal Welfare Act of 1970 amended the LAWA to more generally address issues concerning mammal and bird brutality. In 1976, and relevant to this case, the Animal Welfare Act Amendments of 1976 outlawed for the first-time all animal fighting ventures in which animals were moved in interstate or foreign commerce. <u>See</u> P. L. No. 94-279, 90 Stat. 417 (1976). An animal fighting venture extended to any event involving a fight "between at least two animals" for purposes "of sport, wagering, or entertainment", except events where animals hunt other animals. <u>Id.</u> Anyone found engaging in these activities was subject to a monetary fine ($5,000 maximum) or imprisonment (1-year maximum). <u>Id.</u> Nonetheless, the amendments contained a provision, sub-section (d), which exempted live-bird fighting ventures if the fight occurred "in a State where it would be in violation of the laws thereof." <u>Id.</u> For purposes

Civil No. 19-1481 (GAG)

of the AWA, the term "State" included, and *still does*, "the Commonwealth of Puerto Rico, and any territory or possession of the United States." Id.

Following this initial ban, Congress has gradually expanded the range of animal fighting prohibitions, notably those concerning live-bird fights.  In 2002, the Farm Security and Rural Investment Act of 2002, P. L. No. 107-171, 116 Stat. 134 (2002), limited the live-bird exemption through a "Special Rule for Certain States" provision which applied to persons who sponsored or exhibited live-birds in a fighting venture only if said persons knew that "any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce." Id.  In 2007, the Animal Fighting Prohibition Enforcement Act, Pub. L. No. 110-22, 121 Stat. 88 (2007), increased the imprisonment penalty to a 3-year maximum felony and made it unlawful for a person to "knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird" for purposes of a live-bird fighting venture. Id.  The "sharp instruments" prohibition applied equally to all "States", as defined under the AWA. Id. Pursuant to these amendments, Congress also modified the wording of the 1976 original exemption, sub-section (d). Given the 2002 "Special Rule for Certain States" provision, sub-section (d) was now limited to exempt these States from complying with the prohibition on the use of the mail service of the United States Postal Service for purposes of promoting or furthering an animal fighting venture. Id.

The following year, the Food Conservation and Energy Act of 2008, P. L. No. 110-234, 122 Stat. 923 (2008), increased yet again the imprisonment sentence to a five-year maximum and expanded the prohibitions to generally include "possessing" and "training" animals for fighting purposes. Id.  Like the 2007 amendments, Congress made no exemptions for States that lawfully permitted animal fighting ventures.  Finally, in 2014 the Agricultural Act of 2014, P. L. No. 113-79,

Civil No. 19-1481 (GAG)

128 Stat. 649 (2014), banned the attendance to animal fights, or causing individuals less than 16 years old to attend such activities. Likewise, Congress did not make an exception for jurisdictions which had not proscribed live-bird fighting.

To summarize, prior to the enactment of the Section 12616 amendments of 2018, at the federal level a person could not knowingly sponsor or exhibit a live-bird in a fighting venture, except in jurisdictions where it was legal pursuant to the "Special Rule for Certain States" provision, 7 U.S.C. § 2156(a)(3), unless the person knew that the birds participating in the fight were "bought, sold, delivered, transported or received" in interstate or foreign commerce for this purpose. Similarly, a person could not: (1) attend an animal fighting venture or cause a minor younger than 16 years old to attend; (2) possess or train any animal for purposes of a fighting venture; and (3) sell, buy, transport or deliver in interstate commerce any sharp instruments to be attached to a live-bird's leg for fighting. Finally, it was illegal to use the mail service of the U.S. Postal Service to advertise an animal fighting venture or promote sharp instruments designed for live-bird fights, except if this transpires in a State were live-bird fighting was legal under sub-section (d), 7 U.S.C. § 2156(d).

## II.    Motions for Summary Judgment

The parties have both filed statement of uncontested facts and objections to each other's. On the one side, Defendants allege that Plaintiffs fail to comply with Local Rule 56 and FED. R. CIV. P. 56 because most of their proposed facts are immaterial, conclusory or contain information lacking sufficient knowledge to assess its veracity or falsity. (Docket No. 39 at 1-2). For this reason, Defendant United States proposes its own set of seven (7) undisputed facts. Id. at 13-14. On the other hand, Plaintiff Club Gallístico's objects to Defendants' proposed facts and contends that most statements concern questions of law that should be disregarded. (Docket No. 58 at 1).

### A.  Local Rule 56

Civil No. 19-1481 (GAG)

Under Local Rule 56, L. Cv. R. 56, if a party improperly controverts the facts, the Court may treat the opposing party's facts as uncontroverted. See Puerto Rico Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 130 (1st Cir. 2010). Similarly, the Court can ignore "conclusory allegations, improbable inferences, and unsupported speculation." Rossy v. Roche Prod., Inc., 880 F.2d 621, 624 (1st Cir. 1989). Because Plaintiffs filed the present Complaint pursuant to the Declaratory Judgment Act and plead a pre-enforcement facial, and at times as-applied, constitutional challenge to Section 12616, the Court will only consider those undisputed and uncontested facts which are essential to evaluate these contentions.

## B. Relevant Facts

On December 20, 2018 Congress approved the Section 12616 amendments, under the Agriculture Improvement Act of 2018, PL 115-334, 132 Stat. 4490 (2018). (Docket Nos. 39 ¶ 1; 58 ¶ 1). The provisions of Section 12616 go into effect one year after the date of its enactment, to wit, December 20, 2019.  (Docket Nos. 39 ¶ 2; 58 ¶ 2). These amendments eliminate the "Special Rule for Certain States" and sub-section(d) provisions contained in the "Animal Fighting Venture Prohibition" section of the AWA, 7 U.S.C. § 2131 *et seq*. (Docket Nos. 34 ¶ 12; 39 ¶ 3). The ultimate effect, thus, is the prohibition of animal fighting ventures, including live-bird fighting, in every United States jurisdiction, including the Commonwealth of Puerto Rico. Id.

All plaintiffs have participated in animal fighting events, specifically those involving live-birds, either operating or assisting in the operation of these ventures in a manner that might be construed as sponsoring or exhibiting an animal fighting ventures. (Docket No. 34 ¶¶ 4; 29). Plaintiffs have also bought or sold live-birds, and "sharp instruments" as defined by the AWA, in interstate commerce for fighting and non-fighting purposes. (Docket No. 34 ¶¶ 26-27).

Civil No. 19-1481 (GAG)

Besides the parties, the Commonwealth of Puerto Rico, the Resident Commissioner (the sole representative in Congress from the Commonwealth), the Commonwealth's House of Representatives and Senate, the Asociación de Alcaldes (Mayors' Association),[6] the Municipality of Mayagüez, and Attorney Juan Carlos Albors have presented briefs, as *amici curiae*, in support of Plaintiffs.[7]

### C. Arguments in Support of Motions for Summary Judgment

Plaintiffs' Motion for Summary Judgment arguments can be classified in two main categories: structural constitutional violations, notably to federalism principles, and fundamental rights infringements.   First, Plaintiff Club Gallístico claims that Section 12616: (1) exceeds Congress's authority to regulate and legislate cockfighting activities under the Commerce Clause and the Territorial Clause; (2) violates the Tenth Amendment's anti-commandeering doctrine; (3) constitutes a bill of attainder, and (4) is "locally inapplicable" to the Commonwealth of Puerto Rico pursuant to the Federal Relations Act, 48 U.S.C. § 734.   As for the second line of arguments, Plaintiffs assert that Section 12616 specifically infringes a "cultural right" to cockfighting and more broadly violates their First Amendment freedom of speech and association rights; their Fifth Amendment, substantive and procedural Due Process rights, and limits their right to travel. Finally, Plaintiffs assert that the enforcement provision of Section 12616 effectively amounts to an impermissible taking of their property because it has devalued and, thus, requires a just compensation.

In turn, Defendants posit in their Cross-Motion for Summary Judgment that, pursuant to the

---

[6] The Court notes that this party's brief was originally stricken from the record (Docket No. 46) as it referred to the President of the United States in an improper manner.  A corrected brief was filed the next day. (Docket No. 48).

[7] The Court also notes that it did not consider the untimely filed *amicus* brief by the Animal Wellness Foundation, in support of Defendants' cross-motion for summary judgment. (Docket No. 76).

Civil No. 19-1481 (GAG)

Commerce Clause and the Territorial Clause, Congress can restrict animal fighting in the fifty States and extend this prohibition to all territories. Defendants also contend that the Tenth Amendment does not apply to the Commonwealth of Puerto Rico and that Section 12616 preempts, through the Supremacy Clause any law or regulation that legalizes cockfighting in the territory. Similarly, Defendant further argues that Section 12616 does not meet the exceptional requirements that produce a bill of attainder, that Congress explicitly intended the amendments to apply it in the territory and that no physical or regulatory taking has, or will, occur because property devaluation needs no compensation. Consequently, Defendants conclude that Section 12616 does not violate the Constitution in any form or manner. Additionally, Defendants aver that Plaintiff Club Gallístico lacks standing to challenge several AWA provisions because they were not contested within the general six-year statute of limitations, under 28 U.S.C. § 2401(a).

Plaintiffs' Reply to Defendants' motion for summary judgment rehashes most of their main arguments and, additionally, argues that they have standing to attack those AWA provisions that now fully apply to the Commonwealth.  (Docket No. 57).

Grounded on the foregoing analysis, Plaintiff Club Gallístico and others' Motion for Summary Judgment is **DENIED** and Defendant United Sates and others' Cross-Motion for Summary Judgment is **GRANTED**.

### D.  Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See FED. R. CIV. P. 56(a). A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); see also Calero-Cerezo

Civil No. 19-1481 (GAG)

v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). Under Rule 56, "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Under this standard, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citing Anderson, 477 U.S. at 249-50). Finally, summary judgment may be appropriate if the parties "merely rest upon conclusory allegations, improbable inferences, and unsupported speculation." Rossy, 880 F.2d at 624; see also Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 51 (1st Cir.2010) (citing Adria Int'l Group, Inc. v. Ferré Dev. Inc., 241 F.3d 103, 107 (1st Cir.2001)) (internal quotation marks omitted). Although each motion for summary judgment must be decided on its own merits, "each motion need not be considered in a vacuum." Watchtower Bible Tract Soc'y of New York, Inc. v. Municipality of Ponce, 197 F. Supp. 3d 340, 348 (D.P.R. 2016) (citing Wells Real Estate, 615 F.3d at 51). "Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time, applying the same standards to each motion." Wells Real Estate, 615 F.3d at 51 (quoting P.R. American Ins., 603 F.3d at 133) (internal quotation marks omitted).

Besides this well-known standard, the Court also considers the Supreme Court's formulations for assessing a declaratory judgment that challenges statutes, facially and as-applied, grounded on constitutional rights violations.  See Libertarian Party of New Hampshire v. Gardner,

Civil No. 19-1481 (GAG)

843 F.3d 20, 24 (1st Cir. 2016).  See also Gillian E. Metzger, Facial and As-Applied Challenges Under the Roberts Court, 36 FORDHAM URB. L. J. 773, 796 (2009).  The Declaratory Judgment Act serves the valuable purpose of enabling litigants to clarify legal rights and obligations before acting upon them. Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534-35 (1st Cir. 1995). The question in declaratory judgments is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). For this reason, "federal courts retain substantial discretion in deciding whether to grant declaratory relief." Ernst & Young, 45 F.3d at 534.

On the other hand, in United States v. Salerno, 481 U.S. 739, the Supreme Court held that a pre-enforcement facial challenge can only succeed where the plaintiff "establishes that no set of circumstances exists under which the Act would be valid." Id. at 745. See also Hightower v. City of Bos., 693 F.3d 61, 77-78 (1st Cir. 2012) ("[T]hat the statute lacks any plainly legitimate sweep.") (citations omitted) (internal quotation marks omitted). Similarly, in an as-applied challenge, when plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" he or she "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." Babbitt v. United Farm Workers Nat'l. Union, 442 U.S. 289, 298 (1979) (internal quotation marks omitted). See also Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 9 (1st Cir. 2012); McGuire v. Reilly, 230 F. Supp. 2d 189, 191 n. 5 (D. Mass. 2002), aff'd, 386 F.3d 45 (1st Cir. 2004).

In the end, a fundamental premise of judicial review requires courts to presume that all legislation is constitutional. When presented with a claim to invalidate a congressional enactment, a

Civil No. 19-1481 (GAG)

court must find a "plain showing that Congress has exceeded its constitutional bounds." United States v. Morrison, 529 U.S. 598, 607 (2000).

**III.  Discussion**

 **A.  Standing**

  Defendants argue that Plaintiffs lack standing to challenge the constitutionality of several provisions contained in the AWA that were "unaffected by [Section] 12616 [] and have applied to Puerto Rico for years." (Docket No. 38 at 6).  Specifically, Defendant United States posits that Plaintiff Club Gallístico's motion for Summary Judgment attempts to invalidate the prohibition on: (1) attending animal fighting venture; (2) possessing live-birds intended for fighting, and (3) selling and/or buying "sharp instruments" designed for live-bird fights.  See 7 U.S.C. §§ 2156(a)(2); 2156(b); 2156(e). Defendants assert that these provisions applied to the Commonwealth prior to Section 12616's passage. These statutory prohibitions, as explained by Defendants, were enacted in 2014, 2002, and 2007, accordingly. Thus, they cannot be challenged because any such action would fall outside the six-year statute of limitations, under 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.")

  Plaintiffs contend that Defendants' argument "makes no sense" because "How can Plaintiffs *Sponsor or exhibit* their birds for cockfighting if *possessing* gamecocks is illegal? How can Plaintiffs *Sponsor or exhibit* their birds for cockfighting *if they cannot attend* cockfights?" (Docket No. 57 at 4) (emphasis in original). To support this assertion, Plaintiff Club Gallístico claims that "the statute of limitations applicable was equitably tolled, simply because the Agencies in charge of enforcement did not do so. So there was no need to seek redress [,] because in [the Commonwealth] cockfighting is, and was, legal during the statutory period [and] the limitations period had not run." (Docket No.

Civil No. 19-1481 (GAG)

57 at 5-6). Similarly, Plaintiffs advance that their Complaint was timely filed under the "reopener doctrine" and that their claims are not barred by laches. Id. at 7-8.

The doctrine of standing involves "both constitutional and prudential dimension." Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003). "An inquiry into standing must be based on the facts as they existed when the action was commenced." Id. To satisfy "Article III's personal stake requirement vis-à-vis a statutory challenge," plaintiffs bear the burden of demonstrating that they: (1) have suffered an actual or threatened injury in-fact, which is (2) fairly traceable to the statute, and (3) can be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); see also Ramírez v. Sanchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006)

Given the declaratory remedy sought by Plaintiffs, and the Supreme Court's standard for evaluating facial and as-applied challenges to statutes, the Court holds that Plaintiffs indeed have standing to challenge the constitutionality of Congress' extension of the animal fighting prohibition to the Commonwealth of Puerto Rico and those provisions that have existed prior to Section 12616's approval. When assessing alleged constitutional rights violations, "a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement." New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (citing Doe v. Bolton, 410 U.S. 179, 188 (1973)). Nonetheless, the fact that these provisions have not been *frequently* enforced or prosecuted by the federal government does not entail that they have not been applicable to the Commonwealth since 2002, 2007 and 2014, respectively.[8]

**B. Federalism, Commerce Clause and Territorial Clause**

---

[8] In 2016, the Federal Government filed a criminal complaint against defendant Mr. Ehbrín Castro-Correa, for violating 7 U.S.C. § 2156(b) by unlawfully possessing and training dogs for fighting purposes. Following trial, a jury found Mr. Castro-Correa guilty of this charge and was sentences to twenty-one months of imprisonment by this same Court. See United States v. Castro-Correa, No. 16-153 (PG/GAG).

Civil No. 19-1481 (GAG)

The Federalism doctrine involves the shared distribution of power between our national and state governments, while the Separation of Powers' principles establish a system of "checks and balances" between the three branches of government. See Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 1 (5th Ed., 2015). In the present case, both doctrines are intertwined. When the citizens of a state, or territory, challenge the Legislative and Executive's powers to act and regulate their affairs, the Judicial branch asserts its power and is called to solve the controversy. However, a court cannot sit as a "super-legislator" to amend or repeal the work of the other branches, absent a clear showing that they have exceeded the limits of the Constitution. Under our federalist structure and the separation of powers framework, Congress has the undeniable authority to treat the Commonwealth of Puerto Rico *uniformly* to the states and eliminate live-bird fighting ventures across every United States jurisdiction. The source of this authority rests primarily in the Commerce Clause and Supremacy Clause and alternatively in the Territorial Clause.

### a.  Commerce Clause

Plaintiffs' main argument involves an allegation that Section 12616 was not enacted to regulate interstate commerce, under the Commerce Clause, but rather "to burden [them] on the basis of their identity as residents of a territory" and does not pass rational basis review.  (Docket No. 34 at 21). In support, Plaintiff Club Gallístico avers that these amendments are essentially a "criminal law that have nothing to do with commerce," Id. at 24, and that Congressional findings do not support the same because "no committee and/or public hearings . . . were scheduled." Id. at 42. Plaintiff Club Gallístico further contends that other states have on "their own volition and choosing, decided to make cockfighting illegal, not the federal government." Id. at 26. Finally, Plaintiffs assert that Congress cannot ban these fighting events based on "moral concerns" as reflected from the

Civil No. 19-1481 (GAG)

statements made by members of Congress during the House of Representatives session debate about the Section 12616 amendments.

On the other hand, the United States argues that other federal courts "have had no difficulty finding the animal fighting prohibition, as applied to the states, to be an appropriate exercise of the Commerce Clause." (Docket No. 38 at 8).  Thus, in this case, the same analysis should apply. In United States v. Gilbert, 677 F. 3d 613 (4th Cir. 2012), the Court held that "Congress acted within the limitations established by the Commerce Clause in enacting the animal fighting statute." Id. at 624.[9] Plaintiffs contend that Gilbert should not apply because they are of "criminal nature." (Docket No. 57 at 8-9). Such proposition is flawed. Congress, pursuant to the Commerce Clause, may enact both civil and criminal laws. See generally United States v. López, 514 U.S. 549 (1995).

The Commerce Clause delegates to Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3.  Congress moreover has the authority under the Commerce Clause to regulate commerce with the Commonwealth of Puerto Rico. Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 7, n. 3 (1st Cir. 1992); accord Estado Libre Asociado v. Northwestern Selecta, 185 P.R. Dec., P.R. Offic. Trans., 40 (P.R. 2012). See also Consejo de Salud Playa de Ponce v. Rullán, 586 F. Supp. 2d 22, 37 (D.P.R. 2008).

The judicial test for analyzing a challenge under the Commerce Clause has evolved over the past decade following the Supreme Court's rulings in United States v. López and United States v. Morrison, 529 U.S. 598 (2000); see also Gonzales v. Raich, 545 U.S. 1 (2005). In this Circuit, there are four factors to consider when determining if a statute regulates an activity that has a substantial

---

[9] Defendants also cite, in support of their Commerce Clause position, the following cases: United States v. Lawson, 677 F.3d 629 (4th Cir. 2012); Slavin v. United States, 403 F.3d 522 (8th Cir. 2005); United States v. Thompson, 118 F. Supp. 2d 723 (W.D. Tex. 1998); United States v. Bacon, 2009 WL 3719396 (S.D. Ill. Nov. 5, 2009).

Civil No. 19-1481 (GAG)

effect on interstate commerce: (1) whether the statute regulates economic or commercial activity; (2) whether the statute contains an "express jurisdictional element" that limits the reach of its provisions; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce, and (4) whether the link between the regulated activity and a substantial effect on interstate commerce was attenuated. United States v. Morales-de Jesus, 372 F.3d 6, 10 (1st Cir. 2004) (citing Morrison U.S. 529 at 610-12). When Congress legislates pursuant to a valid exercise of its Commerce Clause authority, the Court scrutinizes the enactment according to rational basis review. See United States v. Lewko, 269 F.3d 64, 67 (1st Cir. 2001).

When considering the factors set forth by the Supreme Court, and reiterated by the First Circuit, the Court finds that S

ection 12616 does not exceed the Commerce Clause's limits. First, it is unquestionable that the amendments being challenged forbid a quintessential economic activity.  As Plaintiffs and several *amici* parties admit, live-bird fights in the Commonwealth are not only considered a commercial activity but also an allegedly lucrative one.[10] Second, the extension of the animal fighting prohibition to the Commonwealth of Puerto Rico and other territories implies that the statutory definition of "animal fighting prohibition venture" now applies fully to the territory. The current definition states that this event must be one "in or affecting interstate or foreign commerce." 7 U.S.C. § 2156(g)(1). This wording meets the Supreme Court's concern, as expressed in López and Morrison, as to whether the statute at hand has a nexus to interstate commerce.

As to the third factor, provided that Section 12616 extends to the Commonwealth and the other territories an *existing* prohibition, the Court reviews initially the Congressional Committee findings dating back to the original enactment of the animal fighting statute and subsequently those

---

[10] The Court addresses in a separate section the economic impact, presented by Plaintiffs and *amici* parties, on the live-bird fighting prohibition.

on recent amendments. The Sixth Circuit's decision in <u>Gilbert</u>, *supra*, points out, these fighting ventures: (1) "attract fighting animals and spectators from numerous states"; (2) "are or have been advertised in print media of nationwide circulation", and (3) "often involve gambling and other questionable and criminal activities." <u>Gilbert</u>, 677 F. 3d at 625. (citing H.R. Rep. No. 94-801, at 761 (1976)) (quotation marks omitted). Additionally, members of Congress have also considered the connection between animal fighting and avian diseases and the economic consequences that would accompany a "bird flu" pandemic. <u>See</u> 153 Cong. Rec. S451-52 (daily ed. Jan. 11, 2007) (Statement of Sen. Cantwell); 153 Cong. Rec. E2 (daily ed. Jan. 5, 2007) (Statement of Rep. Gallegly). On May 18, 2018, the House of Representative debated the Section 12616 amendments currently being challenged. The proponents, Rep. Peter Roskam (R-Ill.) and Rep. Earl Blumenauer (D-Ore.), noted that Section 12616 sought to extend to the territories the legal standard that already existed with respect to the fifty States. 64 Cong. Rec. 80, H 4213, at H 4221 (daily ed. May 18, 2018) (statement of Rep. Roskam). Moreover, their intention was to close "a loophole" because Congress "***should have no separate rules for States, territories, or anywhere under our jurisdiction***". 164 Cong. Rec. 80, H 4213, at H 4222 (daily ed. May 18, 2018) (statement of Rep. Blumenauer) (emphasis added).[11]

When analyzing these Congressional findings as whole, the Court finds that they are sufficient to support the assertion that live-bird fighting events have a substantial effect on interstate commerce. Therefore, the nexus between extending the live-bird fighting prohibition to the Commonwealth and other territories is not attenuated. On the contrary, there exist a direct connection between the means and the end because live-bird fighting ventures are essentially commercial endeavors that encompass a substantial interstate activity as plainly defined by the statute. The Court

---

[11] To date, nonetheless, there continues to exist federal legislation which discriminates against the United States citizens residing in the territories. <u>See</u> <u>United States v. Vaello Madero</u>, 356 F. Supp. 3d 208 (D.P.R. 2019); <u>Consejo de Salud Playa de Ponce v. Rullán</u>, 586 F. Supp. 2d 22, 23 (D.P.R. 2008).

Civil No. 19-1481 (GAG)

notes that lead Plaintiff Club Gallístico described itself in the Amended Complaint as "tourism mecca" where "many fans and tourists" "yearly flock the territory to participate and/or enjoy the sport;" which includes "visitors from all over the world." (Docket No. 21 ¶¶ 8-9). If taken as true, then the effect on interstate commercial activity is undeniable.

As part of the rational basis analysis, the Court will first entertain arguments concerning general aspects of federalism put forward by Plaintiffs and several *amici* parties. The fact that every State in the Nation has already banned live-bird fights, does not hinder Congress from reinforcing its illegality at the federal level. The animal fighting prohibition has been the law of the land since 1976, yet it created an exemption for States, as defined by the AWA, that specifically permitted live-bird fights in their jurisdictions. As detailed in the introductory section, Congress has progressively closed this legal gap between both "sovereigns" and has now established a federal kind of "mandatory minimum" as to prohibitions on animal fighting activities, particularly live-bird fights. At a state level, every one of the Nation's fifty states, and the District of Columbia, can prosecute any person who unlawfully engages in these events. This state prerogative does not impede the federal government's authority, under its police power, to likewise prosecute these offenses at a federal level. Under Section 12616, the United States can now prosecute people who participate in live-bird fighting events *even* if that jurisdiction legally permits that activity, pursuant to the "Conflict with State Law" provision of the AWA, 7 U.S.C. § 2156(i)(1) ("The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder").  Following the elimination of the AWA's "Special Rule for Certain States" and sub-section(d) provisions, there exists a "direct and irreconcilable conflict" with all jurisdictions, like the

Civil No. 19-1481 (GAG)

Commonwealth of Puerto Rico, that legally allow these activities. For practical purposes, absent the exemptions and under the "Conflict with State Law" provision, Congress has superseded the Puerto Rico Gamecocks of the New Millennium Act and any other Commonwealth regulations involving live-bird fights. See U.S. CONST. ART. VI; Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013) ("A state law that offends the Supremacy Clause is a nullity.") (internal quotation marks omitted). See also Hines v. Davidowitz, 312 U.S. 52, 67 (1941) (Even in the absence of a direct conflict, a state law violates the Supremacy Clause when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.")

The main rationale behind these amendments, according to the Congressional record, was to equate the legal standard applicable to the Nation's fifty States to all its territories, irrespective of other purported "moral" considerations articulated in House of Representative's session debate. For this reason, this Court must defer to Congress's findings on the matter and determines that there exists a rational basis to regulate live-bird fighting in the Commonwealth and other territories because it affects interstate commerce and the means of regulation, a comprehensive prohibition of these fighting ventures, are reasonably adapted to that legislative end. See Heller v. Doe, 509 U.S. 312, 321 (1993) ("[C]ourts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational basis review because it is not made with mathematical nicety or because in practice it results in some inequality.")

### b.  The Territorial Clause

The Territorial Clause gives Congress authority to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. ART. IV, § 3, cl. 2.  Congress's ultimate source of authority over the Commonwealth of Puerto Rico only applies

Civil No. 19-1481 (GAG)

in this case insomuch it decides whether and how a federal statute applies to Puerto Rico. Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 320 (1st Cir. 2012). In this aspect, "[a]ll federal laws, criminal and civil in nature, apply to Puerto Rico as they apply to the States, *unless otherwise provided*." Consejo de Salud Playa de Ponce, 586 F. Supp. 2d at 37 (emphasis added). The Section 12616 amendments were specifically enacted to extend an already nationwide prohibition to the territories.

### c.   Tenth Amendment and Bill of Attainder

Plaintiffs posit that by enacting Section 12616, Congress is requiring the Commonwealth "to enforce a federal law" and dictating "what the Puerto Rico legislature may and may not do, as it pertains to cockfighting" in direct violation of the Tenth Amendment and anti-commandeering doctrine. (Docket No. 34 at 47-49). Defendants counter this position advancing that the Tenth Amendment's federalism protections do not apply to the Commonwealth.  (Docket No. 38 at 21).

The Court agrees with Defendants. It is well settled that "[the]he limits of the Tenth Amendment do not apply to Puerto Rico, which is 'constitutionally a territory,' because Puerto Rico's powers are not '[those] reserved to the States' but those specifically granted to it by Congress under its constitution." Franklin California Tax-Free Tr. v. Puerto Rico, 805 F.3d 322, 344-45 (1st Cir. 2015), aff'd, 136 S. Ct. 1938 (2016) (quoting United States v. Lopez Andino, 831 F.2d 1164, 1172 (1st Cir. 1987) (Torruella, J., concurring)). Likewise, as the Court previously articulated, Congress, under both the Commerce Clause and Supremacy Clause, has essentially preempted the law and regulations that legalized live-bird fighting ventures in the Commonwealth.

On the other hand, Plaintiffs argue that the Section 12616 amendments create "an unconstitutional bill of attainder aimed and [at] preventing conduct that Congress fears they might engage in . . . the violation of laws of those states banning cockfighting and/or certain paraphernalia

Civil No. 19-1481 (GAG)

1   or specific activities." (Docket No. 34 at 51). Similarly, Plaintiff Club Gallístico avers that these

2   amendments "clearly singles out an easily identifiable group of people" and punishes them for

3   engaging in a "cultural right." Id.

4        For a statute to qualify as a bill of attainder it must: (1) specify the affected person or group,

5   (2) impose punishment by legislative decree, and (3) dispense with a judicial trial. Elgin v. U.S.

6   Dep't of Treasury, 641 F.3d 6, 19 (1st Cir. 2011). The Supreme Court "has struck down statutes on

7   bill of attainder grounds only *five times* in the nation's history." Id. (emphasis added). The Section

8   12616 amendments do not come even close to meeting these requirements. As Defendants correctly

9   point out in their cross-motion these amendments: (1) "identif[y] particular proscribed conduct,

10   which would amount to a violation no matter who performed it" and (2) "establish[] a general norm

11   for conduct and allows for violations of the act to be adjudicated by the *Judiciary*, not the

12   Legislature." (Docket No. 38 at 22).

13        **d. Puerto Rico Federal Relations Act**

14        Plaintiff Club Gallístico and other *amicis* argue that Section 12616 is "locally inapplicable"

15   under the Puerto Rico Federal Relations Act, 48 U.S.C. § 734. The test for examining whether a law

16   can be "locally inapplicable" to the Commonwealth is well-established under First Circuit's

17   precedent. The inquiry as to whether a statute applies to the Commonwealth of Puerto Rico entails

18   "matters of congressional intent." United States v. Acosta-Martínez, 252 F.3d 13, 18 (1st Cir. 2001)

19   (citing People of Puerto Rico v. Shell Co., 302 U.S. 253, 258 (1937)). "If Congress has made clear

20   its intent that a federal statute apply to Puerto Rico, then the issue of whether a law is otherwise

21   'locally inapplicable' does not, by definition, arise." Id.

22        It is unquestionable that Section 12616 applies to the Commonwealth. As Defendants point

23   out the title for the amendments *explicitly* reads: "Extending prohibition on animal fighting to the

24

Civil No. 19-1481 (GAG)

territories" and the legislative history shows Congress's undeniable intention to extend the animal

fighting venture prohibition to the Commonwealth. (Docket No. 38 at 22).

### C.  Plaintiffs' Constitutional rights claims

Plaintiffs argue that Section 12616 violates several rights under the Constitution of the

United States. At the outset, Plaintiffs posit that cockfighting should be classified as a fundamental

"cultural right" pursuant to the United Nations' Universal Declaration of Human Rights and the

Puerto Rico Gamecocks of the New Millennium Act. (Docket No. 34 at 8). No such right exists in

our Federal Constitution and the Supreme Court has consistently rejected any expansion to the Bill

of Rights. See Washington v. Glucksberg, 521 U.S. 702, 720 (1997).[12] Plaintiff Club Gallístico aims

to establish a "cultural right" by drawing parallels to other fundamental rights, such as freedom of

speech and association, free exercise of religion, substantive and procedural due process, equal

protection, and right to travel, among others, attempting to trigger a strict or heightened scrutiny

analysis. The Court applauds Plaintiffs' legal creativity, however rejects said argument. The AWA,

and the Section 12616 amendments, can only be construed as socioeconomic legislation and, as

previously discussed, satisfy a rational basis scrutiny. Nonetheless, the Court will address Plaintiffs'

constitutional rights claims *seriatim*.

### a.  First Amendment

Plaintiffs' First Amendment claim is two-fold. First, they allege that the live-bird prohibition

"facially targets conduct," unduly burdening their right to speech and that said prohibition does not

survive a judicial challenge under the test for symbolic protected expression enunciated in United

---

[12] Even a wide-ranging analysis of the Ninth Amendment, U.S. CONST. amend. IX, does not seem to contemplate this sort of "cultural rights." Id. ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."). Justice Robert Jackson once stated, "Ninth Amendment rights . . . are still a mystery to me." Robert H. Jackson, The Supreme Court in The American System of Government 74-75 (1955).

Civil No. 19-1481 (GAG)

States v. O'Brien, 391 U.S. 367 (1968). (Docket No. 34 at 22-23). Furthermore, Plaintiff Club Gallístico contends that these amendments violate their right to free association because Plaintiffs are entitled to "perpetuate their culture through assembly and cockfighting." (Docket No. 34 at 21-22). Defendant United States opposes these arguments asserting that Section 12616 has not "curtailed Plaintiffs' ability to speak or associate in favor of cockfighting and its importance to Puerto Rican culture" and that pursuant to United States v. Stevens, 559 U.S. 460 (2010), the depiction of animal cruelty may be considered protected expression, but not the conduct itself. Alternatively, Defendants point out that the amendments comply with the O'Brien test.

The Court agrees with Defendants. A live-bird fighting venture does not fall within any expressive or non-expressive protected conduct. Even if it falls under a protected category, "[t]he government has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." Texas v. Johnson, 491 U.S. 397, 406 (1989). On this issue, the Supreme Court has constantly rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." O'Brien, 391 U.S. at 376; see also Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993). It is undisputed that the AWA's statement of policy, and legislative aim over the decades, includes a rejection of animal violence. 7 U.S.C. § 2131 ("The Congress further finds that it is essential to regulate the . . . care, handling, and treatment of animals . . . by persons or organizations engaged in using them . . . for exhibition purposes . . . or for any such purpose or use.") In this aspect, "expressive activities that produce special harms distinct from their communicative impact" are not entitled to constitutional protection. Roberts v. United States Jaycees, 468 U.S. 609, 628 (1984). Moreover, the Court agrees with Defendant United States' reading of Stevens, which establishes a distinction between an artistic

Case 3:19-cv-01481-GAG   Document 77   Filed 10/28/19   Page 25 of 29

Civil No. 19-1481 (GAG)

expression, such as depicting a wounded or dead animal, from a non-artistic conduct, i.e. participating in animal fights that may lead to injury or death of participating animals.

As for the right to association claim, the Section 12616 amendments, will not prohibit Plaintiffs from assembling to discuss and express their views regarding cockfighting and other cultural issues. Nevertheless, their right to assemble, under the First Amendment, does not encompass protect assembly for unlawful purposes or to engage in a criminal activity. See De Jonge v. Oregon, 299 U.S. 353, 364-65 (1937); see also Scales v. United States, 367 U.S. 203, 229-30 (1961). Additionally, in support of these claims, Plaintiffs fleetingly mention in their Motion for Summary Judgment the Supreme Court's decision in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993) in which a Florida city ordinance that prohibited ritual animal sacrifices was struck down. There is no doubt that partaking in live-bird fighting ventures does not violate the Free Exercise Clause, nor can it be classified as a protected religious belief.[13]

### b.  Substantive and Procedural Due Process

Plaintiffs claim that Congress violated their procedural Due Process rights because "Puerto Rico has no real political representation" in the federal legislative branch and consequently had no opportunity to participate in Section 12616's decision-making process. (Docket No. 34 at 42-43). Moreover, they argue that Congress deprived them of a meaningful opportunity to be heard. Id.

The Court finds this argument to be unfounded. Plaintiff Club Gallístico does not have a cognizable liberty or property interest deprived by the Section 12616 amendments. Even if Plaintiffs had a valid property interest, "the legislative process itself provides citizens with all of the process they are due." Correa-Ruiz v. Fortuño, 573 F.3d 1, 15 (1st Cir. 2009) (citations omitted) (quotation marks omitted). The Commonwealth of Puerto Rico might not have a voting member in Congress,

---

[13] It is worth noting that Plaintiffs seemed to have abandoned this argument when opposing Defendants' cross-motion for summary judgment.

25

Civil No. 19-1481 (GAG)

but its Resident Commissioner participated in the House of Representatives legislative session debating this issue and strongly voiced her opposition. See 164 Cong. Rec. 80, H 4213, at H 4222 (daily ed. May 18, 2018) (statement of Rep. González-Colón). The fact that Plaintiffs were unable to effectively lobby against the approval Section 12616 cannot be remedied by a court of law as it involves a political task delegated to the political branches of government. In this respect, the Court reminds Plaintiffs that "[t]he entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself *about the particular policies that affect his destiny*." Atkins v. Parker, 472 U.S. 115, 131 (1985) (emphasis added). More so, despite the undemocratic predicament existing in the Commonwealth of Puerto Rico, the lack of consent of principle does not violate the Constitution. See Pedro-Vidal, 371 F. Supp. 3d at 59.

On the other hand, Plaintiff Club Gallístico also avers that Section 12616 amendments infringe their substantive Due Process cultural right to "cockfighting." (Docket No. 38; 53). As this Court already pointed out, such right does exist under our constitutional framework and where there "is no fundamental right or suspect classification involved" a rational basis test shall be applied. Hammond v. United States, 786 F.2d 8, 13 (1st Cir. 1986). Once again, Section 12616 complies with the requirements for this easily-met judicial scrutiny. The Court notes that Plaintiffs presented an "equal protection" claim pursuant to the Due Process Clause, yet barely develop it in their motions and reply. As discussed in the beginning of this Opinion and Order, this action, if anything, illustrates an equal treatment before the law, rather than an unequal one.

### c.  Right to Travel

Plaintiff Club Gallístico contend that under Section 12616 its members will not be able to travel freely within the United States "to practice and perpetuate their culture" (Docket No. 34 at 56). Although the Constitution protects a right to travel interstate and abroad, it is not an absolute

Civil No. 19-1481 (GAG)

constitutional guarantee. This right does not entail a fundamental right to travel for an illicit purpose. See Hoke v. United States, 227 U.S. 308, 320-323 (1913). See also Jones v. Helms, 452 U.S. 412, 418-19 (1981). Following the approval of these amendments, any travel involving live-birds, or sharp instruments intended for fighting, shall constitute an unlawful act, outside of any constitutionally protected activity.

### D.  Takings Clause

Finally, Plaintiffs put forward that the prohibition takes their "real and personal property without just compensation" and that they are "no longer able to maintain, support, or sell their gamecocks because these breeds are considered by the market to be useless for any non-cockfighting purpose." (Docket 34 at 57). Moreover, Plaintiffs argue that their cockpits "are no longer able to be maintained, supported, or sold at their true value as these properties exist and are regulated for the specific purpose of cockfighting." Id. at 58. As to this specific allegation, Plaintiff Club Gallístico adds objection to Defendants' cross-motion that there "should have been on notice that this prohibition was coming and that their investments carried some risks." (Docket 57 at 34).

To analyze this contention, the Court need only asses whether the Section 12616 amendments constitute reasonable exercise of Congress' police power even if they substantially have the effect of reducing the value of certain property or prohibiting the most beneficially economic use of said property. See Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002); Andrus v. Allard, 444 U.S. 51 (1979).   In Andrus, the Supreme Court considered the Eagle Protection Act and the Migratory Bird Treaty Act which, among other things, made it unlawful to possess or transport bald or golden eagles or to engage in such activities with respect to migratory birds. As a general norm, the Supreme Court reiterated that "[t]he Takings Clause . . . preserves governmental power to regulate, subject only to the dictates of justice and fairness." Id. at 65 (quotation marks omitted).

Civil No. 19-1481 (GAG)

Under this premise it held that the simple prohibition of the sale of lawfully acquired property did not amount to a Fifth Amendment's taking violation. Like the Supreme Court's reasoning in Andrus, in the present case, Section 12616 does not violate the Takings Clause. Even if these recent amendments prevent the most profitable use of Plaintiffs' properties because their value is reduced, this does not necessarily equate to a taking.

As to Plaintiff Club Gallístico's "investment-backed expectation" argument, this Court highlights that: "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 227 (1986); see also Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of Puerto Rico, 189 F.3d 1, 17 (1st Cir. 1999). As Plaintiffs themselves affirm, live-bird fighting venture have been a highly regulated industry in the Commonwealth. (Docket No. 34 at 12).

### E.  Economic Impact

The Court considers necessary to address a central position to Plaintiffs and several *amici* brief, notably the Commonwealth's Senate: the alleged economic impact that the live-bird fighting prohibition could have in the Commonwealth's already precarious economy. The cockfighting industry injects $65 million annually into the Commonwealth's economy and generates a total of 11,134 direct, indirect and induced jobs. See Economic Impact Study of the Cockfighting Report (March 2019) (Docket No. 2-4).[14]

The Court clearly understands the dire economic impact that the cockfighting ban may have. However, without a valid legal ground, a federal court simply cannot sit as a "super-legislator" to

---

[14] Similarly, according to the Senate, the cockfighting industry "has an impact of about eighteen (18) million dollars on the local economy and creates over twenty thousand (20,000) direct and indirect jobs." (Docket No. 60 at 6).

Civil No. 19-1481 (GAG)

amend or repeal the work of Congress. See City of New Orleans v. Dukes, 427 U.S. 297, 303, (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.") As discussed throughout this Opinion and Order, the Section 12616 amendments meet the rational basis standard; a judicial scrutiny which "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." Heller, 509 U.S. at 319.

### F. Conclusion

The Court hereby **DENIES** Plaintiffs Club Gallístico and others' Motion for Summary Judgment and **GRANTS** the United Sates' Cross-Motion for Summary Judgment. The Court further holds that it will not grant any stay pending the parties' appeals before the First Circuit.

**SO ORDERED.**

In San Juan, Puerto Rico this 28th of October, 2019.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge